The Bank of Kaukauna vs. Joannes and others.

=====

THE BANK OF KAUKAUNA, Respondent, vs. JOANNES and others, Appellants.

*December 15, 1897 — January 11, 1898.*

*Fraudulent conveyances: Chattel mortgages: Application of proceeds of sales to mortgagor's use.*

The evidence in this case is *held* to show that the mortgagee of a stock of merchandise permitted the mortgagor to remain in possession of the mortgaged property under an implied or tacit agreement that the latter might use, sell, and dispose of the mortgaged property and apply the proceeds to his own use as if the mortgage had not been executed; that the situation of the parties and property was such that the mortgagee must have known the mortgagor to be dealing with the property in that manner; and that the mortgagee made no objection. The mortgage was therefore fraudulent and void as to attacking creditors.

APPEAL from a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Reversed.*

The Bank of Kaukauna vs. Joannes and others.

The plaintiff brought this action against the defendants for the alleged wrongful taking and conversion of a stock of goods, the stock in trade of Jerry Strong, and which had been mortgaged by him to the plaintiff, August 24, 1888, for $500, with interest until paid at eight per cent. per annum, said stock being at the time in the possession of said Strong. It was averred that the mortgage was filed in the office of the city clerk of Kaukauna, where Strong resided, on the same day, and the plaintiff demanded judgment against the defendants in the sum of $600, with interest, etc. It contained the usual power of seizure and sale, and stipulated that, as long as the conditions of the mortgage were fulfilled, said Strong was to remain in peaceful possession of the property, and in consideration thereof was to keep the same in as good condition as it then was, at the cost and expense of the mortgagor. The defendants justified the seizure and alleged conversion under a writ of attachment in favor of the defendants as copartners under the name of Joannes Bros., for about $720, issued about the 5th of May, 1888, against said Jerry Strong, from the circuit court for Outagamie county, and it appeared from the said writ that the sheriff of said county levied upon and took into his custody and possession the property in question; that by virtue of an order entered in the action wherein the attachment was issued the sheriff sold portions of the property as perishable, and the remainder was sold on execution issued on the judgment recovered against said Strong.

Evidence was given tending to show that said Strong, upon and at all times from the date of said chattel mortgage to the time of levying said attachment, conducted a general grocery business in Kaukauna, and merchandised, sold, and disposed of the stock in question covered by the said chattel mortgage, conducting said business in the ordinary and due course of business, and by the consent of the plaintiff and its agent, and disposed of the proceeds thereof as he saw fit

in support of his family, and paying expenses of the business, and in the same manner as though no mortgage thereon had been executed. The mortgage was put in evidence, as well as the writ of attachment and proceedings thereunder, and also the judgment roll in the case of Joannes Bros. and others against Strong, showing a recovery in their favor against Strong of a judgment of $843.33 and $91.20 costs.

The question litigated at the trial to which the testimony was principally directed was whether the chattel mortgage on the said stock was fraudulent and void as against the defendants and others of his creditors on the ground that the mortgagor carried on business in the store, and dealt with his stock, in the same manner, in all respects, after the mortgage was executed as before, and to the knowledge and with the consent of the plaintiff; that Strong did not account to the plaintiff for the proceeds of sales made from day to day, and it never asked or demanded that he should; that it knew that Strong had no means of paying the current expenses of the business and supporting his family other than from the stock, and knowingly permitted him to sell and dispose of the stock, and use the proceeds as he pleased in paying store and family expenses and debts other than the plaintiff's, pursuant to an implied or tacit understanding to that effect. The stock was sold under the execution and judgment.

The trial was before the court without a jury, the court finding that the allegations of the complaint were true; that the defendants wrongfully took possession of the goods and chattels described in the chattel mortgage, of the value of $800; that it was entitled to recover of the defendants the sum of $500, with interest at eight per cent. from February 24, 1888, amounting to $843.33, with costs, and judgment was given accordingly, from which the defendants appealed.

The defendants asked the court to find in support of their contention substantially as stated, and that the plaintiff permitted Strong to remain in possession of the mortgaged

property, and continue his business, after its execution, until the attachment was levied, in precisely the same manner as he had done before the execution of the mortgage, using the proceeds to replenish the stock from time to time, and disposing of the balance of such property as he pleased, pursuant to an understanding or tacit agreement between Strong and the plaintiff to that effect; and that the chattel mortgage was fraudulent and void as against Strong's creditors, including the defendants.    These findings were refused.

It appears from the evidence of Towsley, the plaintiff's cashier, that he made Strong the $500 loan February 24, 1888, and took the note and chattel mortgage, as agent for the plaintiff.    May 5, 1888, Joannes Bros. and Weise & Hollman took the stock under an attachment, Sheriff *Golden* acting as officer in the matter, in Strong's store.    During the time he was in business, from July 1, 1887, to about December 1st, he had seen Strong in the bank.    He had no deposit there, but did have February 24th.    His store was the next store to the bank, about twenty feet from the door of the bank.    The stock was groceries, crockery, glassware, lamps, and fixtures.    Before making the loan, he went into the store, and saw what he had there, and went again on May 3d.    The stock looked the same as it did February 23d or 24th, as to quantity and quality.    " I suppose he had been in possession of the stock from February 24th to May 5th. I knew he kept right on in his business just as before.    I understood he was there continuing the business the same as before.    I knew he was dealing there in business.    I supposed he was paying expenses.    To my knowledge, he continued dealing with this stock just the same after February 24th as he did before.    Don't know that we had any understanding that he was to add to the stock he then had.    I suppose he carried on his business just as he did before. He rented the store from Mr. Reuter, the president of the plaintiff bank.    I paid no attention at all to the store after

I took the chattel mortgage, no more than I did before. Went on, and let him do as he pleased. Did not pay any attention to it. Have no positive recollection of buying anything there between February 23d and May 3d, but my family bought, I think, in April, 1888."

Jerry Strong testified on the part of the defendants that he executed the mortgage at the request of Towsley, plaintiff's cashier, on the stock of goods, February 24, 1888, and was then indebted between $1,700 and $1,800. "I bought goods from seven or eight different parties, and was owing at least seven or eight different parties for merchandise when the mortgage was given. After the mortgage was executed, I continued the business with the stock' of goods as I had done before. The business ran the same as ever. The giving of the mortgage made no difference in the management of the business, and it so continued up to the time I quit business. I had no property other than the stock of goods, fixtures, etc., in my business, aside from the household furniture and the horse and delivery rig, and no other income than that which I derived from my business and the stock of goods that had been mortgaged. With the proceeds of the business from day to day I paid my bills as fast as I could, and lived, of course. Paid bills right along that came due out of the proceeds of the stock that I received after the mortgage was given. I had a family at the time, and was keeping house. Part of the proceeds of the business was used in the support of my family. We derived our support from no other source than the proceeds of this business. Continued to pay creditors, support my family, and pay the expenses of the business as I had done before, and conducted my business in precisely the same manner as before the mortgage was given, and as though it had never been executed. No part of the proceeds of the business was ever paid on the mortgage. No portion of the mortgage has ever been paid. Was never asked by the bank or its officers, or by the cashier, to pay any part of the proceeds upon that liability. I

The Bank of Kaukauna vs. Joannes and others.

purchased new goods as before,— approximately between $400 and $500 worth,— and they were put in with the others. I don't know whether Mr. Towsley was acquainted with my financial condition. He never asked any questions. I think he knew this business was my only source of income. He knew I was not doing anything else. I saw him every day, and quite often during the day I was in the bank and he in the store. We were close neighbors. From the proceeds of the business I bought drafts from the bank, subsequent to the mortgage, to pay bills; and I supposed he knew of it, he acting as cashier. I never deposited any money. Mr. Towsley used to be in the store every day, probably once or twice, and knew how I was managing the business. He never made any objection to my disposing of the proceeds as I pleased. He never said a word about it. He knew I was receiving money for the sales, and never made any demand on me for the sales, nor did he direct how to dispose of the money. When the mortgage was executed, neither he nor any other officials of the bank directed in any manner whatever how the proceeds should be disposed of. Q. Tacitly understood that you should go on with the business as before? A. I suppose so, there was nothing said. . . . Peter Reuter, the president, dealt with me after the mortgage was executed and before, and paid me the money on his bills after the execution of the mortgage the same as before. He was there in the store when I was making sales and receiving money, but did not direct how the proceeds should be disposed of. I suppose he knew, in a general way, about my financial affairs. He could see. That is about all. I rented a house, and kept house, and clothed my family; and all this came out of the business up to the time of the attachment."

· There was other evidence tending to prove the facts relied on by the defendants.

In rebuttal Mr. Towsley testified that when the loan was made to Strong he knew nothing of his financial condition;

that the loan was put to Strong's credit, and checked out by him in buying drafts; that he had no recollection of being in the store but once. Mr. Reuter, the president, also testified that he did not know anything about Strong's financial affairs on February 24, 1888, or between that date and May 3d; that he never owed him or paid him any bills; and during the time Strong was conducting his business he (witness) was out of town most of the time; that he could see goods there, and, so far as he knew, it was the same one time as another.

For the appellants there was a brief by *Greene, Vroman & Fairchild,* and oral argument by *C. E. Vroman.* They contended, *inter alia,* that the only inference to be drawn from the evidence was that there was a tacit or implied agreement that the mortgagor should deal with the goods and continue the business after the mortgage in the same manner as before, applying the proceeds to the payment of his personal expenses. The mortgage was therefore void as to creditors of the mortgagor. *Place v. Langworthy,* 13 Wis. 629; *Steinart v. Deuster,* 23 id. 136; *Anderson v. Patterson,* 64 id. 557; *Barnet v. Fergus,* 51 Ill. 352; *Rosenthal v. Vernon,* 79 Wis. 248; *Potts v. Hart,* 99 N. Y. 168; *Gangen v. Hachemeister,* 114 id. 566, 571; *Griswold v. Sheldon,* 4 id. 581, 588; *Southard v. Benner,* 72 id. 424, 429; *Wilson v. Voight,* 9 Colo. 614; *First Nat. Bank v. Wittich,* 33 Fla. 681; *Standard Imp. Co. v. Schultz,* 45 Kan. 52; *Brown v. Barber,* 47 id. 527; *Wile v. Butler,* 4 Colo. App. 154; *Putnam v. Osgood,* 51 N. H. 192, 208; *Huschle v. Morris,* 131 Ill. 587; *Simmons v. Jenkins,* 76 id. 479, 483; *Goodheart v. Johnson,* 88 id. 58, 61; *Smith v. Epley,* 55 Kan. 71; *Joseph M. Hayes Woolen Co. v. Gallagher,* 58 Minn. 502; *Tallon v. Ellison,* 3 Neb. 73; *Martin-Perrin M. Co. v. Perkins,* 63 Mo. App. 310; *Blakeslee v. Rossman,* 43 Wis. 116, 123; *Merchants' & M. S. Bank v. Loveland,* 84 id. 611.

*G. H. Dawson,* for the respondent.

The Bank of Kaukauna vs. Joannes and others.

Pinney, J.   The conclusive inference from the facts testified to by the witnesses is that there was an implied or tacit agreement or understanding that the mortgagor was to be at liberty to use, sell, and dispose of the mortgaged property, and apply the proceeds to his own use, in like manner as before, and as if they had not been mortgaged to the bank.   It is evident that the plaintiff knew, or had the ready means of knowledge, of the manner in which Strong was dealing with the mortgaged property.   Strong's store and the stock of goods, which was not large, was next door, and within twenty feet of the entrance of the bank.   No objection was made on the part of the plaintiff to his course of proceeding, and no effort was made to show that the property or its proceeds was applied to the payment of the mortgage debt.   The evidence was very cogent and convincing that the mortgage was given with the understanding mentioned, and there was no fair or adequate explanation offered of the transaction consistent with the integrity and validity of the mortgage.   As said in *Anderson v. Patterson*, 64 Wis. 559: "That the inevitable tendency and effect of a mortgage, fair and valid on its face, but void because of some extrinsic or secret infirmity, must be to hinder and delay the creditors of the mortgagor in the collection of their debts, is perfectly obvious, and the parties cannot be heard to say that they did not intend that such effect should result from their actions.   .   .   .   When property is mortgaged to one creditor to secure his demand, good faith to other creditors of the mortgagor requires that, if the same is sold, the proceeds shall be applied to the payment of the mortgage debt." The case of *Anderson v. Patterson, supra*, and cases there cited, are decisive.   We must hold that the chattel mortgage relied on by the plaintiff is fraudulent and void, and the trial court should have given judgment for the defendants accordingly.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment in favor of the defendants.